MOLBREAK and wife, and others, Appellants, v. VILLAGE OF SHOREWOOD HILLS, Respondent.

*No. 292.   Argued November 26, 1974.—Decided February 17, 1975.*
(Also reported in 225 N. W. 2d 894.)

688

For the appellants there were briefs by *Molbreak Law Office,* and oral argument by *Bryan D. Woods,* all of Madison.

For the respondent there was a brief and oral argument by *James C. Geisler,* village attorney.

DAY, J.   This is an appeal from a judgment entered on December 29, 1972, affirming the special assessments levied by the village of Shorewood Hills (village) on two parcels of land abutting University Avenue in Dane county owned by Vernon Molbreak and Jean D. Molbreak, Harvey E. Schmidt and Adeline Schmidt, and Leonard W. Schmock and Janet Schmock (landowners), appellants.

The respondent village of Shorewood Hills levied special assessments for street, curb and gutter improvements on the north side of University Avenue from its intersection with University Bay Drive to the west limits of the village.   These improvements run along University Avenue between the village of Shorewood Hills and the city of Madison.   Part of the westbound (north) lanes of

University Avenue are within the village of Shorewood Hills.

The city of Madison and the village agreed that the total cost of improving University Avenue to the village would be $100,000. This was to be the village's share of a project in which the federal government participated. In addition, the village agreed to pay an estimated $40,000 for other items such as street lights, signals, sanitary sewer, and water main relocation. The federal government did not share the cost of these items and therefore they were called "nonparticipating" items for which the abutting landowners were not assessed. University Avenue was widened from four lanes to six lanes and a median strip was constructed to divide the east-bound traffic from the westbound traffic. The roadbed was reconstructed and curbs and gutters were installed.

On November 8, 1971, the board of trustees of the village declared by preliminary resolution its intention to exercise special assessment powers under sec. 66.60, Stats. 1971.[1]

---

[1] "66.60 **Special assessments and charges.** (1) (a) As a complete alternative to all other methods provided by law, any city or village may, by resolution of its governing body, levy and collect special assessments upon property in a limited and determinable area for special benefits conferred upon such property by any municipal work or improvement; and may provide for the payment of all or any part of the cost of the work or improvement out of the proceeds of such special assessments.

"(b) The amount assessed against any property for any work or improvement which does not represent an exercise of the police power shall not exceed the value of the benefits accruing to the property therefrom, and for those representing an exercise of the police power, the assessment shall be upon a reasonable basis as determined by the governing body of the city or village.

"(2) Prior to the exercise of any powers conferred by this section, the governing body shall declare by preliminary resolution its intention to exercise such powers for a stated municipal purpose. Such resolution shall describe generally the contemplated purpose, the limits of the proposed assessment district, the number

The resolution directed the board of public works of the village and the village engineer to prepare a report on the estimated costs of the improvements and the estimated benefits and damages to each parcel abutting University Avenue. The resolution stated the improvements included the grading of the street, the surfacing of the street with concrete, the installation of curb and gutter on the north side of the street and the provision of private entrances to all property on the north side of the street. The resolution also provided:

"The total amount assessed against such district shall not exceed 100% of the cost of the improvements and the amount assessed against any parcel shall not be greater than the benefits accruing thereto from said improvements."

The report of the board of public works and the village engineer was made to the board of trustees on March 30, 1972. Schedule C of the report consisted of a list of properties with estimates of benefits and damages and net benefits and damages for each parcel of property.[2]

of instalments in which the special assessments may be paid, or that the number of instalments will be determined at the hearing required under sub. (7), and direct the proper municipal officer or employe to make a report thereon. Such resolution may limit the proportion of the cost to be assessed."

[2] "66.60 **Special assessments and charges.** . . .

"(3) The report required by sub. (2) shall consist of:

"(a) Preliminary or final plans and specifications.

"(b) An estimate of the entire cost of the proposed work or improvement.

"(c) An estimate, as to each parcel of property affected, of:

"1. The assessment of benefits to be levied.

"2. The damages to be awarded for property taken or damaged.

"3. The net amount of such benefits over damages or the net amount of such damages over benefits.

"(d) A statement that the property against which the assessments are proposed is benefited, where the work or improvement constitutes an exercise of the police power. In such case the esti-

The report stated that estimates had been made from a view of each parcel. Schedule C states that proposed assessments for street, curb and gutter improvements were $16.72 per front foot.

Two separate parcels are involved in the instant suit. One parcel is undeveloped and zoned Commercial E and measures 392.62 feet fronting on University Avenue and was assessed $6,564.61. The second parcel is zoned Residential A, is located on the corner of Maple Terrace and University Avenue adjacent to the commercially zoned parcel and runs along University Avenue for 105 feet and was assessed $1,755.60. The estimated assessments in Schedule C for all property assessed was $100,000, of which the village was assessed $41,929.26.

Notice of public hearing was given and a public hearing was held on April 10, 1972. The minutes of the meeting show that Mr. Molbreak appeared and objected on the ground that the parcels did not benefit to the extent of the assessment. On May 15, 1972, the board of trustees of the village passed the final resolution authorizing street and curb and gutter improvements and the levying of special assessments against the property alleged to be benefited. The resolution was published on May 23, 1972.

The appellants appealed to the circuit court from the final resolution of the village on the ground that their properties received no special benefit from the improvements. Trial was to the court.

Mr. Herbert S. Roth was called as a witness by the village. He testified he was the engineer and administrator for the village. He described in general the improvements to be made on University Avenue and specially described the improvements alleged to benefit the two parcels here

mates required under par. (c) shall be replaced by a schedule of the proposed assessments."

involved. He testified the improvements included construction of a major intersection at Maple Terrace which would permit eastbound traffic to turn left onto Maple Terrace. The improvements included a concrete roadway fronting the properties on University Avenue, curb and gutter, storm-drainage facilities to take care of street water, street lighting and installation of a hydrant. Mr. Roth stated University Avenue was improved so it would accommodate a larger volume of traffic and provide greater public safety. He said the assessment figure of $16.72 per front foot was arrived at by dividing $100,000, the amount to be contributed by the village for participating costs, by the number of linear feet fronting on the north side of University Avenue in the village, which was slightly less than the city of Madison assessed property owners per front foot on the south side of University Avenue. He testified the board of public works decided to assess each lot the same amount per front foot because of their opinion that the properties would benefit similarly from the roadway, curb and gutter improvements. Most of the properties were commercial and he also testified that those properties currently zoned residential had commercial possibilities, which was the reason the residential property was assessed the same amount per front foot. He stated that in his opinion both parcels in question here benefited from the improvements to the extent they were assessed. He stated the commercial property has greater potential for development and that the improvement of University Avenue provides greater safety, that the curb and gutter improved the property aesthetically, that for commercial purposes the increased traffic exposed the property to greater number of potential customers. He admitted that the median strip had limited the access to the properties and that it did not add to the properties' value. He also agreed that the commercial property sloped away from the street and

water from the property would not drain into the gutter of the street.

As to the residential parcel, Mr. Roth testified that it had the potential of being developed commercially and therefore received potential benefits equal to the benefits received by the property which was already zoned as commercial. He did concede that noise from increased-traffic flow was detrimental to the residential property. He stated, however, that the present zoning in the area is "interim zoning" and stated that under the present Residential A zoning, the house could be torn down and a driveway leading to the commercial property could be constructed.

Harvey Schmidt, one of the landowners and appellants in this case, testified he was experienced in commercial and residential land development. Mr. Schmidt testified that loss of access to traffic going east because of the median strip would have a detrimental effect on the commercial property. He testified that the property would receive no benefit from the curb and gutter because of the slope of the land. He said there never had been a water problem on the residential property and the curb and gutter were of no benefit to that parcel either. He said increased traffic would make both residential and commercial property less desirable. He testified the parties had purchased the residential property with the hope it could provide access to the commercial property after the median strip was constructed. Mr. Verne Halle testified for the appellants that he was a real estate broker and experienced appraiser. He stated he inspected the two parcels at appellants' request. He did not make an appraisal of the commercial property; however, he did testify that in his opinion the median strip, because of its effect on ingress and egress, would have a depressing effect on the value of the properties here involved and that the anticipated increase in the amount of traffic

would have an adverse effect on ingress and egress to the properties, particularly the ingress.

Mr. Halle did appraise the residential property and testified that in his opinion prior to the improvement it had a value of $20,000, but that following completion of the highway improvement it would be worth $1,000 less. He attributed the decrease in value to the anticipated increase in traffic and noise and gave as his opinion that the curb and gutter were of no value and not needed for this residential property. He also testified that in his opinion Mr. Roth was in error regarding the village zoning ordinances and that the present zoning ordinance would not permit construction of an access driveway to the commercial parcel.

Mr. Wayne Simpson, a land developer and a witness for the landowners, stated he had viewed the two parcels involved and that in his opinion the median strip created an access problem which would depress the value of the commercial property. He testified the commercial property would receive no benefit from the curb and gutter. He did not make an appraisal as to the value of the commercial property. He testified that the larger traffic count could be a benefit or a detriment to commercial property depending upon what type of commercial use was made of it, but he testified it was definitely a detriment to the residential property.

After hearing the testimony, the trial court found that the village was entitled to a presumption that the two parcels benefited to the amount assessed against them and that the presumption had not been rebutted by the landowners. The assessments were affirmed.

The principal question on appeal is, did the commercial and residential properties of the appellants receive benefits from the improvement of University Avenue to the extent of the special assessments levied against them?

Where an assessment is to be made on benefits received and where the record before the trial court from the municipality shows that the statutory procedure was followed in levying the assessment and where a view of the premises alleged to be benefited was made by those responsible for the assessment and where the assessment is stated to be made on the basis of benefits received by the abutting property, that there arises a presumption in favor of the assessing body that ". . . the officers proceeded regularly and performed their duties until the contrary is made to appear by competent evidence." *Soo Line RR. Co. v. Neenah* (1974), 64 Wis. 2d 665, 671, 221 N. W. 2d 907.

It has long been the rule in this state that where the assessing body did consider what property would be benefited by the improvement and assessed according to the amount of the benefit, that in the absence of evidence to the contrary there is a conclusive presumption that the assessment was on the basis of benefits actually accrued. *Hennessy v. Douglas County* (1898), 99 Wis. 129, 139, 74 N. W. 983. *See also: Friedrich v. Milwaukee* (1903), 118 Wis. 254, 256, 95 N. W. 126.

The language in *Schildknecht v. Milwaukee* (1944), 245 Wis. 33, 40, 13 N. W. 2d 577, saying that "On appeal the burden of proof is on the city to show that the property is benefited the amount claimed" is overruled. On appeal in order to overcome the presumption,[3] the burden is on the objector to show either that the statutory procedure was not followed, or that the assessment was not based on benefits, or that the assessing authority did not view the premises to make such a determination, or to produce competent evidence that the assessment is in error.

---

[3] *See also:* 14 McQuillin, *Municipal Corporations* (3d ed.), sec. 38.184:

"There is a presumption that the findings of a city council as to special benefits are correct, and this presumption can be overcome only by strong, direct, clear and positive proof."

The next question which presents itself is, was there sufficient evidence introduced at the hearing before the trial court to overcome the presumption in favor of the village that the assessments were valid?

At the hearing, the village engineer testified that each lot was assessed at $16.72 per front foot. This figure was arrived at by dividing the amount the village had agreed to contribute to the project for participating costs by the number of linear feet fronting on the north side of University Avenue in the village.

The appellants call our attention to the case of *Hayes v. Douglas County* (1896), 92 Wis. 429, 65 N. W. 482, where the assessment by front footage was criticized as indicating that the board had acted arbitrarily rather than exercising its judgment. A reading of *Hayes* at pages 441, 442, shows that the case is distinguishable on its facts from the one before us. In *Hayes* the court said,

"This so-called assessment was made in the office of the city engineer, and without actual view and consideration, by the board of public works, of the benefits actually accruing to each parcel by reason of the improvement. . . .

". . . While such an assessment is not necessarily erroneous, it is presumed to be so, unless the return shows that the board has considered that matter and finds that the benefits are in the proportion of the frontage of each parcel."

In the instant case, the taxing authority actually viewed the premises and made the assessments on the basis of benefits received.

In *Kersten v. Milwaukee* (1900), 106 Wis. 200, 204, 81 N. W. 948, 81 N. W. 1103, this court in criticizing an assessment based on front footage stated that "Especially is this so when it is shown that opposite some of the lots there was a deep cut and others a deep fill. It is not enough for the board to *say* that they viewed the premises and exercised their judgment, if the *facts* negative that

assertion." In the case at bar, there is no evidence indicating that there is any difference in the physical conditions facing the lots in question with other lots which were likewise assessed.

In the case of *Hennessy v. Douglas County, supra,* page 138, this court in upholding assessments for street improvements based on a front-foot basis distinguished the *Hayes Case.* Referring to *Hayes,* the court said, "The reports did not, as in the present case, certify or assert that the assessment was according to the *benefits* accruing to such lot or parcel of real estate by such improvement." The *Hennessy* court went on to say at page 140:

"The fact that in the report the board gave the frontage of the lots upon the street, or that they assessed upon each lot the exact cost of the improvement in front of the same, will not, of itself, vitiate the assessment."

In *Sanderson v. Herman* (1901), 108 Wis. 662, 668, 84 N. W. 890, 85 N. W. 141, the court held that uniformity of assessment alone was not enough to overcome the presumption that the board based the assessments on benefits if it so asserted. The board of public works expressly certified that they viewed each lot and determined the benefits and damages to each. The record shows that such was also done in the case before us.[4]

We first consider the parcel zoned "Commercial E." We agree with the trial court that the property owners failed to produce sufficient evidence to overcome the presumption of the validity of the assessment. The appellants did produce three witnesses who testified that

[4] *See* report of the board of public works on proposed street and curb and gutter improvements and assessments dated March 30, 1972, wherein it states "Estimate of benefits and damages and net benefits and damages as to each parcel of property affected. Such estimate has been made from a view of each parcel."

the median strip would limit access to the commercial parcel and in their opinion that would have a depressing effect on its value. However, as the trial court pointed out, no evidence was offered as to the value of the property prior to the improvement and the value of the property following the improvement. The difference, if any, would show whether the property value had been enhanced or diminished as a result of the improvements. *Bekkedal v. Viroqua* (1924), 183 Wis. 176, 198, 196 N. W. 879, 197 N. W. 707.

In addition, Mr. Roth testifying for the village pointed out the increased safety that the median strip afforded and that such safety benefited the commercial enterprises abutting the highway. He said the curb and gutter have aesthetic value and compared the situation existing on University Avenue prior to the time the improvements were made. The court, in its opinion, pointed out the hazards which had previously existed on the avenue when eastbound traffic crossed the westbound lanes to enter properties on the north side of University Avenue. The median strip provides access points that make entry from the eastbound to the westbound lanes safer. It also made it safer for people entering or leaving the commercial property of the owners. The landowners point out that much of the value of the improvements is for the use of the general public and that the benefits are public benefits. The fact that an improvement confers a general benefit on the community does not mean that certain property cannot benefit specially. *Brock v. Lemke* (1969), 51 Hawaii 175, 455 Pac. 2d 1, 3; 63 C. J. S., *Municipal Corporations,* p. 1057, sec. 1314.

In the case of the property zoned "Residential A," we conclude that the landowners did rebut the presumption of the validity of the assessment and that the trial court erred in its finding that because the highest and best use of the residential parcel is for development with the

commercial property adjacent to it that it is therefore subject to the special assessments.

Mr. Halle testified that the value of the residential property prior to the improvements was $20,000 and that its value following the road improvement was $1,000 less or $19,000. He arrived at this conclusion on the basis that its value as residential property was decreased because the increased flow of traffic would create additional noise which would make this parcel less desirable as a residential property. The trial court stated in its memorandum opinion that based on continued residential use "probably Mr. Halle is correct in his conclusion . . ." but the court went on to state that the highest and best use of the residential parcel is for development with the larger commercial parcel to the west. The court found that the evidence made it clear that this is what the landowners had purchased the residential property for, to use it as a means of ingress and egress to and from the larger parcel. When the larger parcel is sold, it would only be natural to sell the residential property in connection with it and that its development would then be part of the development of the larger commercial property. The trial court in its conclusions of law stated that the presumption that the residential property was benefited in the amount assessed against it had not been rebutted by the landowners.

The landowners contend that a zoning change would be required before this residential parcel could be used in conjunction with the commercially zoned parcel and therefore it cannot be assessed on potential use, citing *Wm. H. Heinemann Creameries v. Kewaskum* (1957), 275 Wis. 636, 641, 82 N. W. 2d 902. The court in *Heinemann* stated that the weight of authority is that ". . . benefits arising from improvements which depend upon *contingent* future action of public authorities should not be considered in assessing benefits." The village on the

other hand contends that future benefits to the property may be considered in assessing benefits, *Duncan Development Corp. v. Crestview Sanitary Dist.* (1964), 22 Wis. 2d 258, 125 N. W. 2d 617. In *Duncan* the court upheld special assessments by a sanitary district for an elevated water tank and held that the trial court was in error when it said that part of the assessment was invalid because some of the plaintiffs' property was not certain to enjoy the use of water within a reasonable time in the future. The court held a benefit could accrue without any actual use of the improvement and stated that the availability of a central facility to supply water enhanced the value of the property over the value of the lot or property whose only source of water would be a private well and also held that additional enhancement in value accrues when water mains are laid in the street or adjacent to the property so that connection can be made for actual use even though the water mains were not in the street or adjacent to the property at the time the assessment was made. *Duncan,* page 269, also held that the time when the benefit would accrue is within the "reasonable control of the plaintiffs."

*Duncan* is distinguishable from the instant case, however, because the court found that the existence of the elevated water tank itself enhanced the value of the properties. In the present case, it is not seriously argued that the improvement of University Avenue enhances the value of the residential property as long as its use remains residential. There was conflicting testimony as to whether an access driveway to the commercial property could be constructed on the residential property as it is currently zoned. Mr. Roth, the village engineer, testified the property could be used for such a purpose even though it is zoned Residential A. Mr. Halle, the appellants' expert, testified that Mr. Roth was incorrect in stating that the present zoning would permit the land-

owners to construct an access highway across the residential property. The village ordinances were not introduced into evidence at the trial; however, certified copies of secs. 6.02 and 13.04 of the municipal code of the village of Shorewood Hills, with amendments in effect as of the date the assessments were levied and still in effect as of December 2, 1974, were presented to the court and we take judicial notice of them.[5] We do not pass on

[5] The relevant portions of the municipal code are as follows:
"6.02 CONSTRUCTION OF DRIVEWAY ENTRANCES AND APPROACHES
"(1) *Definitions.* . . .
"(b) 'Class I' driveway shall mean all of those by which a street is connected with a residence, private garage, or other improved property and ordinarily used by only the owner or occupants of the premises, his guests, and necessary service vehicles.
"(c) 'Class II' driveway shall mean all of those by which a street is connected with private or public property and which is used for commercial purposes or which will ordinarily carry a much heavier traffic movement than 'Class I'. . . .
"(e) The term 'permit' shall mean a permit to construct a driveway entrance and approach of a specified class granted by the Board upon application thereof in accordance with this ordinance. . . .
"(2) *Permit Required.* No driveway entrance and approach leading from any street to the lot line of any lot shall hereafter be constructed without first filing an application and obtaining a permit from the Board issued in accordance with the regulations contained herein."

"13.04 'AA' AND 'A' RESIDENCE DISTRICTS
"(1) *Use.* In the 'AA' and 'A' Residence District, no building or premises shall be used and no building shall be hereafter erected or altered, unless otherwise provided in this ordinance, except for one or more of the following uses:
"(a) One family dwelling
"(b) Churches
"(c) Any of the following accessory buildings: One private garage, when located not less than sixty feet from the front line or as a part of the main building; one children's play house, one boat house, pavilions, detached porches, arbors, fences, except that fences the faces of which do not permit the passage of

whether or not, under the wording of the ordinance, the granting by the village of such a permit would be permissible; however, it is clear that it would require action by the board of public works. Mr. Roth also testified that a change in the zoning to commercial was a possibility "if the owners could get a majority of the property owners to consent." We disagree with the trial court's conclusion that the certainty of getting a required change in the use to which this property could be put is sufficiently definite to warrant assessing it on the basis of such potential use.

In *Hietpas v. State* (1964), 24 Wis. 2d 650, 656, 657, 130 N. W. 2d 248, a condemnation case, the court stated that special benefits accruing to land not taken in eminent domain, which may be set off against damages if they enhance the market value immediately after taking of the land remaining "include . . . imminent adaptability of the land to a higher and better use from an economic standpoint because of proximity to the public improvement; . . ." The burden of proof as to such benefits is on the condemnor. If the benefits are contingent upon a zoning change, the court stated that a prospective use prohibited by zoning regulations may not be considered; however, if it can be shown that there is a reasonable probability that the zoning regulations will be changed in the immediate future to accommodate such use, the

light and air through 60% of each square foot of their area shall not exceed four feet in height, and uses incident to any of the uses set out in (a) and (b) of this subsection, including home occupations, as set forth in (d) below, engaged in by the occupants of a dwelling.

"(d) Customary, incidental home occupations or professions which do not change the character of residence districts in which found; do not interfere with the peace and quiet of the neighborhood; do not increase or create traffic hazards; or in any manner interfere with the right of residents to enjoy the residential character of these districts. . . ."

trier of fact may consider the prospective use in its consideration of benefits. However, it is necessary for the party claiming the benefit to show that zoning regulations governing the land in question presently permit the changed use or that a reasonable probability exists that zoning in the near future will accommodate such a use. A mere possibility or an assumption on the part of the witness is not enough and must be rejected as being speculative.

This rule was further clarified in *Bembinster v. State* (1973), 57 Wis. 2d 277, 284, 285, 203 N. W. 2d 897. This was a case involving eminent domain proceedings in which the landowner attempted to prove the value of the property based on its highest and best use. The court stated that where a zoning ordinance prohibits the most advantageous use of the property, the landowner may show there is a reasonable probability of rezoning which will allow for the highest use. The court stated that the question is, how may a landowner meet his burden of showing the probability of such rezoning? The court cited *Hietpas* for the proposition that a reasonable probability that a zoning restriction may in the near future be repealed or amended so as to permit a greater use cannot be proved by an opinion based upon a possibility or an assumption or can the probability of change in legislation be proved by the opinion of board members or legislators. The court went on to point out that the type of evidence which has been admitted as material and intending to prove a reasonable probability of change includes the granting of many variances which showed a continuing trend that will render rezoning probable, the actual amendment of the ordinance subsequent to the taking and an ordinance rezoning neighboring property. The village failed to submit evidence of a type that the *Bembinster* court held was required to show the probability of a zoning change. The testimony of the village engineer

that in his opinion the board would authorize the driveway over the properties presently zoned (assuming this is permissible under the cited ordinances) or would probably rezone the property if a majority of the property owners on the block agreed is the type of evidence that the *Bembinster* and *Hietpas* decisions held to be insufficent. We hold that the evidence did not substantiate the finding of benefits to the residential property and did not establish a reasonable probability of change in the permitted use of the property so that it could in fact be used "for development with (commercial parcel)" as found by the trial court.

Under sec. 66.60 (12) (d), Stats., the trial court has the power to affirm, annul, or modify and affirm as modified an assessment.[6]

Therefore, that part of the judgment of the lower court assessing the commercial property (tax assessment parcel No. 54–01690.1.1) in the amount of $6,564.61 is affirmed and that part of the judgment assessing the residential property (tax assessment parcel No. 54–016777) in the amount of $1,755.60 is reversed and set aside.

*By the Court.*—Judgment affirmed, in part; reversed, in part; cause remanded for entry of judgment in accordance with this opinion; no costs allowed.

---

[6] "66.60 **Special assessments and charges.** . . .

"(12) . . . (d) Upon appeal pursuant to this subsection, the court may, based upon the improvement as actually constructed, render a judgment affirming, annulling or modifying and affirming, as modified, the action or decision of the governing body. If the court finds that any assessment or any award of damages is excessive or insufficient, such assessment or award need not be annulled, but the court may reduce or increase the assessment or award of damages and affirm the same as so modified. . . ."